U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 DEC 16  AM 10: 41

CLERK
BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| United States of America, | |
| Plaintiff, | Civ. No. _2:20-cv-213_ |
| v. | |
| University of Vermont Medical Center, | **COMPLAINT** |
| Defendant. | |

The United States alleges on information and belief as follows:

### INTRODUCTION

1. The United States brings this civil action to stop Defendant University of Vermont Medical Center (UVMMC) from punishing health care personnel who follow their conscience and refuse to perform abortions. The United States also brings this civil action because UVMMC's conduct violates the Health Programs Extension Act of 1973, Pub. L. No. 93-45, § 401, 87 Stat. 91, 95-96 (codified at 42 U.S.C. § 300a-7), more commonly referred to as the Church Amendments. Defendant violated the Church Amendments when it chose intentionally and willfully to discriminate against a nurse who plainly made her objection to participating in abortions based on her religious beliefs or moral convictions known to Defendant UVMMC. This violation makes up just part of UVMMC's ongoing pattern, practice, and policy of discriminating against health care providers who believe that the performance, or the assistance in the performance, of abortions is contrary to their religious beliefs or moral convictions (conscience objectors).

2. A bipartisan Congress enacted the Church Amendments to prohibit grantees of the Department of Health and Human Services (HHS) from discriminating against health care personnel who "refuse[ ] to perform or assist in the performance of [an] abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(c)(1).

3. As a grantee of funds from HHS, Defendant UVMMC must comply with the Church Amendments. Defendant UVMMC has also signed contractual assurances with HHS promising that UVMMC would comply with federal law, including the Church Amendments.

4. Defendant UVMMC refuses to comply with the Church Amendments despite HHS's notice of non-compliance and efforts to bring Defendant into voluntary compliance.

5. The United States accordingly seeks a declaratory judgment that Defendant has violated the Church Amendments, and an order from this Court directing Defendant fully to comply with the Church Amendments and uphold the contractual assurances it made to HHS promising to comply with the Church Amendments.

**DEFENDANT**

6. Defendant University of Vermont Medical Center is a non-profit corporation under section 501(c)(3) of the Internal Revenue Code with its principal place of business in Burlington, Vermont.

7. Defendant is a healthcare entity that operates multiple health care facilities providing services in Vermont.

8. Before 2014, UVMMC was known as Fletcher Allen Health Care.

9. Defendant accepts direct financial assistance from the federal government through a grant administered by the Health Resources and Services Administration (HRSA) within HHS.

10. Defendant is and has been at all relevant times a recipient of federal funds under the Public Health Service Act (PHSA), 42 U.S.C. § 300 *et seq.*

11. As a condition of receiving PHSA funds, Defendant provided contractual assurances to HHS that it would comply with all Federal statutes relating to nondiscrimination.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

13. Declaratory and injunctive relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202.

14. Venue is proper in the District of Vermont under 28 U.S.C. § 1391(b). Defendant resides in Vermont, and a substantial part of the events or omissions giving rise to this claim occurred in the District of Vermont.

## BACKGROUND

15. Congress enacted the Church Amendments at various times during the 1970s in response to debates over whether judicially recognized rights to abortion or sterilization might lead to the requirement that health care personnel participate in activities to which they have religious or moral objections.

16. The Church Amendments consist of five provisions, codified at 42 U.S.C. § 300a–7, that protect those who hold religious beliefs or moral convictions respecting certain health care procedures from discrimination by entities that receive certain Federal funding. Recipients of a grant, contract, loan, or loan guarantee under the PHSA must comply with subsection (c)(1) of the Church Amendments. Subsection (c)(1) applies to those recipients' decisions on employment, promotion, or termination of employment, as well as extension of staff or other privileges with respect to physicians and other health care personnel. 42 U.S.C. § 300a–7(c)(1)(A)-(1)(B). This subsection prohibits those recipients from discriminating in these decisions based on an

individual's refusal to perform or assist in an abortion or sterilization because of religious beliefs or moral convictions.  42 U.S.C. § 300a–7(c)(1).

## DEFENDANT UVMMC'S DISCRIMINATION

17.  In approximately 1972, Defendant UVMMC instituted a policy that prohibited elective abortions from being performed at its facilities, although Defendant permitted abortions it deemed medically necessary.  Defendant reaffirmed this policy in 1984, and it remained Defendant's official policy until Defendant modified the policy to permit elective abortions in approximately 2017.

18.  Since at least approximately 2008, UVMMC has maintained at its nursing station a list (the Objector List) of staff who have objected to performing or assisting with abortion procedures.

19.  UVMMC staff would voluntarily place their names on the Objector List if they did not want to participate in any abortion procedures.  The list provided names with a "yes" or "no" indication of whether the listed individual has an objection to abortion procedures.

20.  Sometime in 2017, UVMMC reversed its 1972 abortion policy and adopted an express policy of providing access to elective abortions.

21.  Before this written policy change in 2017, Defendant had allowed, in practice, elective abortions to be performed at its facilities since at least 2016.

22.  In approximately 2017, Defendant altered the Objector List to allow health care personnel to specify whether they objected to assisting with medically necessary abortions, elective abortions, or both.

23.  Since at least 2017, Defendant has discriminated against conscience objectors because of their religious beliefs or moral convictions opposing abortion in the ways summarized in paragraphs 24 through 63.

4

24.  Defendant has forced and attempted to force or required conscience objectors to assist with abortions when such personnel object that assisting with abortions violates their religious beliefs or moral convictions.

25.  Defendant has intentionally, unnecessarily, knowingly, and unlawfully attempted to force or required conscience objectors nurses or other health care personnel to assist with abortions when such assistance violates the religious beliefs or moral convictions of nurses or other health care personnel.

26.  Defendant has failed or refused to adopt staffing plans and rotations that would fully respect the known religious beliefs or moral convictions of conscience objectors who do not wish to participate in abortions.

27.  Defendant has scheduled conscience objectors, including nurses, to assist with elective abortions despite specific and repeated requests from those personnel not to be assigned to elective abortions because of their religious beliefs or moral convictions.  Moreover, Defendant has repeatedly assigned conscience objectors to participate in elective abortions without giving advance notice of the nature of the procedure.

28.  Defendant has scheduled conscience objectors to assist with elective abortions knowing that other staff, who did not object because of religious beliefs or moral convictions, were available to assist with the procedures.

29.  Although Defendant could have readily, and without interruption to patient services, accommodated the religious beliefs or moral convictions against participation in elective abortion of conscience objectors, Defendant nevertheless intentionally and unnecessarily assigned conscience objectors to such procedures.

30. Defendant has subjected conscience objectors to different terms or conditions of employment than healthcare personnel who do not share the same religious or moral objections.

31. Defendant has discriminated against conscience objectors by accommodating health care personnel with non-religious or non-moral objections to assisting with certain procedures and refusing to accommodate conscience-objecting health care personnel.

32. For example, Defendant accommodated nurses who requested not to assist in caring for an intoxicated driver who killed five people.

33. Defendant accommodated nurses who requested not to assist in procedures with certain doctors with whom the nurses felt uncomfortable.

34. Defendant effectuated its discrimination through certain employees, nursing leadership, and managers who expressed overt disregard or hostility to religious beliefs and moral convictions against participating in abortion.

35. For example, one nursing manager, who was involved in scheduling health care personnel, repeatedly expressed disdain for conscience objectors.

### Nurse 1: Compelled Participation in Abortion Procedure

36. Nurse 1 began working for Defendant UVMMC (then Fletcher Allen) in 2008.

37. Nurse 1 was a conscience objector.  Shortly after her new employee orientation in 2008, Nurse 1 placed her name on the Objector List when she learned that UVMMC performed medically necessary abortions.

38. Sometime in 2016 or 2017, UVMCC informally began to perform elective abortions.

39. In 2017, Defendant deliberately scheduled Nurse 1 to assist with an elective abortion. Defendant also misled Nurse 1 to believe that she was scheduled to assist in a procedure that did not involve the elective abortion of a fetus with a heartbeat, when the scheduled procedure in fact did.

6

40. The UVMMC nurse scheduler and doctor performing the abortion knew that Nurse 1 was a conscience objector.

41. When Nurse 1 walked into the operating room to assist with the procedure that was already underway, the doctor looked at Nurse 1 and stated "please don't hate me" in reference to Nurse 1's assistance with the elective abortion.

42. When Nurse 1 discovered the true circumstances of the scheduled procedure, she immediately objected and requested that a non-objecting nurse assist with the elective abortion.

43. Defendant's nurse scheduler refused to accommodate Nurse 1's request.

44. Defendant's nurse scheduler refused to assign an available, non-objecting nurse to assist with the abortion.

45. Defendant's refusal to relieve Nurse 1 coerced Nurse 1 into assisting with the elective abortion. Defendant's refusal left Nurse 1 with the coercive choice of assisting with the abortion or placing the patient's health in danger. Moreover, Nurse 1 potentially faced disciplinary action from Defendant or from licensing authorities if she had abandoned the patient.

46. On this and other occasions, Nurse 1 reasonably feared that Defendant would fire her or take other adverse employment actions against her if she followed her conscientious objection to assisting with abortions.

47. Under Defendant's then-effective Conflict of Care Policy, any refusal to participate in the abortion procedure once she was misled into entering the operating room would have subjected Nurse 1 to "being placed on paid leave while the incident [was] reviewed" and to "corrective action up to and including termination of employment."

48. Defendant's actions caused Nurse 1 deep emotional trauma.

49. Defendant's discrimination against Nurse 1 is part of a pattern or practice of discrimination against conscience objectors.

50. Defendant scheduled approximately 10 nurses whose names were on the Objector List or who Defendant otherwise knew were conscience objectors to assist with approximately 20 abortion procedures.

### Discriminatory Conflict of Care Policies

51. Beyond this pattern or practice of discrimination, Defendant has adopted and implemented discriminatory official policies that invalidly limit staff members' ability to decline to participate in abortions.

52. From approximately May 2014 through February 2018, Defendant's conflict of care policy (2014 Policy) listed "Termination of pregnancy" as a potential procedure to which a staff member could object.

53. That 2014 Policy did not mandate that Defendant not schedule a staff member for abortion procedures, even when that staff member had previously submitted a written objection to assisting with abortions because of the staff member's religious beliefs or moral convictions.

54. Even when the staff member objected in advance, the 2014 Policy explained that "there will be an understanding that if events prevent the accommodation, the employee will be expected to perform assigned duties, so he or she does not negatively affect the delivery of care or services."

55. The 2014 Policy then subjected conscience-objecting health care personnel to punitive measures, including the deprivation of staff privileges and the prospect of termination of employment: "Refusing to provide care will result in the employee being placed on paid leave while the incident is reviewed. The review may result in corrective action up to and including termination of employment."

56. Defendant amended its 2014 Policy in approximately February 2018 (2018 Policy).

57. The 2018 Policy changed "Termination of pregnancy" to "Elective termination of pregnancy" as a potential procedure to which a staff member could object.

58. Defendant's 2018 Policy authorizes Defendant to schedule a conscience objector to assist with abortions even after the conscience objector submits a written objection to assisting with abortions.

59. Even when the conscience objector objects in advance, the 2018 Policy provides that the "Supervisor/designee will assign staff as necessary for appropriate patient coverage."

60. Regardless of any previous employee objection, the 2018 Policy provides that "[i]n any scenario where circumstances prevent arrangements for alternate coverage, the [objecting] staff member will be expected to provide the assigned care to ensure that patient care is not negatively impacted."

61. The 2018 Policy further provides that "refusal to perform assigned job functions will be addressed in accordance with established corrective action procedures, in consultation with leadership and Human Resources."

62. The 2018 Policy does not require any particular measures on the part of Defendant to find alternate coverage and does not set forth a process for an objecting staff member to appeal a determination that circumstances prevent arrangements for alternate coverage.

63. Defendant's February 2018 conflict of care policy remains in effect.

## HHS INVESTIGATION AND FINDINGS

64. On approximately May 9, 2018, Nurse 1 filed a complaint with the Office for Civil Rights (OCR) at HHS, alleging that she and other nurses who Defendant employed had suffered discrimination in violation of laws protecting the right to refuse to assist with the performance of abortions.

9

65.  OCR investigated Nurse 1's complaint.  That OCR investigation made findings substantially the same as the facts alleged in paragraphs 24 through 63.

66.  Based on the facts ascertained through its investigation, OCR sent Defendant a Notice of Violation Letter (NOV) on August 28, 2019.  That NOV is attached to and incorporated into this Complaint as Attachment 1.

67.  That August 2019 NOV found that Defendant was in violation of section 300a-7(c)(1) of the Church Amendments.

68.  Overall, OCR determined that:

    a.  Defendant had forced and attempted to force health care personnel (including nurses) into assisting with abortions over their conscience-based objections;

    b.  Defendant had intentionally, unnecessarily, and knowingly scheduled—and continues to schedule—nurses or other health care personnel who have religious or moral objections to abortion to assist with abortions;

    c.  Defendant subjects health care personnel (including nurses) who have religious or moral objections to abortion to different terms or conditions of employment than healthcare personnel who do not share the same religious or moral objections;

    d.  Defendant discriminates against health care personnel (including nurses) because of their religious beliefs or moral convictions in opposition to abortion; and

    e.  Defendant maintains a conflict-of-care policy that facially violates provisions of the Church Amendments by, among other things, subjecting health care professionals to employee discipline for refusing to assist in abortions.

69. Defendant subsequently denied the Church Amendments violation and refused to voluntarily comply with the Church Amendments and with Defendant's contractual assurances that it had made to HHS promising to comply with the Church Amendments.

70. HHS referred Defendant's violation of the Church Amendments to the United States Department of Justice for enforcement.

71. On December 11, 2020, HHS's HRSA sent a letter to Defendant notifying Defendant that HHS had referred the violation to the United States Department of Justice, and that if Defendant did not sign an Agreement in Principle the United States would pursue legal remedies to enforce compliance with the Church Amendments.  On December 14, 2020, HHS emailed a letter to Defendant that gave Defendant until 10:00 AM on December 16, 2020, to sign the Agreement in Principle.

72. Defendant did not sign, or indicate a willingness to sign, the Agreement in Principle before that December 16, 2020, deadline.

73. All conditions precedent to filing suit have been satisfied.

### HHS FEDERAL FUNDING OF DEFENDANT

74. At all relevant times described in this Complaint, Defendant has been and remains a recipient of PHSA funds from HHS.  Defendant received such funds every year since at least Fiscal Year 1998.

75. Defendant currently receives such funds under a three-year grant covering the period of May 1, 2018, to April 30, 2021 (Grant Number H7600203).

76. During Fiscal Years 2018-2020, Defendant received $1,667,140 from HHS in grant funding under the Ryan White HIV/AIDS Program Part C Early Intervention Services COVID-19 Response and Outpatient Early Intervention Services with Respect to HIV Disease.  Under the Ryan White program, HHS through HRSA provides funding to eligible entities to provide

11

comprehensive HIV primary care and support services in an outpatient setting for low income, uninsured, and underserved people with HIV.

77.  As a condition of receiving federal financial assistance, Defendant has, through its authorized representatives, signed contractual assurances agreeing to comply with all federal laws, including the Church Amendments.

78.  Defendant UVMMC completed an SF 424B certification form entitled "Assurances – Non-Construction Programs" (OMB Form No. 4040-0007) that provides:

> As the duly authorized representative of the applicant, I certify that the applicant: . . . will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to: . . . [ ] ; (i) any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and, (j) the requirements of any other nondiscrimination statute(s) which may apply to the application.

79.  The Church Amendments prohibit HHS grantees, such as Defendant, from "discriminat[ing]" against health care personnel who "refuse[ ] to perform or assist in the performance of [an] abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(c)(1).

80.  Defendant signed and submitted such a certification with its 2018-2021 grant proposal. That certification is attached to and incorporated into this Complaint as Attachment 2.

81.  While HHS generally enforces violations of grant conditions through a termination or suspension of the grant or other administrative related measures affecting the grant itself, HHS has concluded that such an approach is not feasible in this case because of the danger to public health.

82.  Defendant UVMMC is currently the only entity in the state of Vermont that receives Ryan White funding and is the only entity in the state of Vermont capable of participating in the Ryan White HIV/AIDS Program.

83. Terminating or withholding funds from UVMMC could likely have significant negative consequences on the public health.

84. HHS has concluded that the only feasible and adequate remedy that will enforce both Defendant's obligations under the Church Amendments and Defendant's contractual obligation to comply with federal law, while minimizing detrimental impacts on public health, is a federal-court order requiring Defendant to comply with the Church Amendments and Defendant's contractual assurances.

85. Defendant's specific performance of its contractual obligations to HHS is the only way to ensure both compliance with federal law and the terms and conditions agreed to by the Defendant and the availability of healthcare services to those in need.

## CLAIM:

## VIOLATION OF PROHIBITION ON DISCRIMINATION

86. Plaintiff re-alleges and incorporates by reference the allegations set forth in all paragraphs above.

87. The Church Amendments provide:

(c) Discrimination prohibition

(1) No entity which receives a grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Services and Facilities Construction Act after June 18, 1973, may--

(A) discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, or

(B) discriminate in the extension of staff or other privileges to any physician or other health care personnel,

because he performed or assisted in the performance of a lawful sterilization procedure or abortion, because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious

13

beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.

42 U.S.C. § 300a-7(c)(1).

88. Defendant has received a grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Services and Facilities Construction Act after June 18, 1973.

89. Defendant's acts or omissions above have violated the Church Amendments.

90. Defendant signed a contractual assurances agreement with the United States that all programs and activities receiving federal financial assistance would be conducted in compliance with federal law, including all of the requirements of the Church Amendments.

91. Defendant has failed to comply with its contractual assurances.

92. Unless restrained by this Court, Defendant will continue to violate the Church Amendments and Defendant's contractual assurances.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court:

    a.   Declare that Defendant has violated the Church Amendments and Defendant's contractual assurances;

    b.   Order Defendant specifically to comply with all of its obligations under the Church Amendments and to enjoin any conduct to the contrary;

    c.   Order Defendant to enact a conflict of care policy that complies with all of the requirements of the Church Amendments; and

    d.   Order such other relief as the interests of justice may require.

DATED:  December 16, 2020

CHRISTINA E. NOLAN
United States Attorney

_____
JONATHAN A. OPHARDT
First Assistant United States Attorney
District of Vermont
P.O. Box 570
Burlington, VT 05402
802-951-6725
jon.ophardt@usdoj.gov

ERIC S. DREIBAND
Assistant Attorney General

CYNTHIA M. McKNIGHT
Deputy Assistant Attorney General

_____
MATTHEW J. DONNELLY
Attorney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-616-2788
matthew.donnelly@usdoj.gov

# Attachment 1

# Notice of Violation Letter



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          **OFFICE OF THE SECRETARY**

Voice - (800) 368-1019   TDD - (800) 537-7697   Fax - (202) 619-3818          **Office for Civil Rights**
http://www.hhs.gov/ocr/                                                                                    **200 Independence Ave., SW**
                                                                                                                  **Washington, DC 20201**

August 28, 2019

*VIA U.S. MAIL AND ELECTRONIC MAIL (**REDACTED**)*

**REDACTED**, Esq.
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775

        Re: OCR Transaction Number 18-306427

Dear **REDACTED**:

        On May 9, 2018, **REDACTED** ("**REDACTED**" or "Complainant") filed a complaint with the Office for Civil Rights ("OCR") of the U.S. Department of Health & Human Services ("HHS").[1] The complaint alleges that **REDACTED** and other employees of the University of Vermont Medical Center ("UVMMC")[2] "suffer[ed] discrimination and violations of [their] conscience rights under federal law."[3] As part of its investigation, OCR gathered facts, interviewed witnesses, and offered UVMMC multiple opportunities to provide relevant evidence and otherwise respond to the allegations.[4]

        Based on the facts ascertained through its investigation, OCR finds UVMMC in violation of section 300a-7 of Title 42 of the U.S. Code ("the Church Amendments"), specifically, paragraph (c)(1)(A) and (B). OCR has specifically determined that:

- UVMMC has forced and attempted to force health care personnel (including nurses) into assisting with abortions over their conscience-based objections;

---

[1] The Secretary has delegated authority for handling such complaints to OCR. *See e.g.*, OCR Statement of Organization, Functions, and Delegations of Authority, 83 Fed. Reg. 2,802, 2,803 (Jan. 19, 2018).

[2] Prior to 2014, UVMMC was formerly named Fletcher Allen Health Care. UVMMC, *Fletcher Allen to the UVM Medical Center*, https://www.uvmhealth.org/medcenter/Pages/About-UVM-Medical-Center/Fletcher-Allen.aspx (last visited June 11, 2019).

[3] Letter from Counsel for **REDACTED** to Centralized Case Mgmt. Operations, Office for Civil Rights, U.S. Dep't of Health & Human Servs., 2 (May 9, 2018) (hereinafter "Complaint") (on file with OCR).

[4] UVMMC responded to OCR's notice of investigation and information request by denying that it had violated the religious and conscience rights of its employees, taking issue with OCR's investigative authority, and providing substantive responses to less than half of OCR's questions. *See* Letter from **REDACTED**, Partner, McDermott Will & Emery LLP, to Mandi Ancalle and David Hyams, Office for Civil Rights, U.S. Dep't of Health and Human Serv. (Dec. 14, 2018) (on file with OCR).

- UVMMC intentionally, unnecessarily, and knowingly schedules nurses or other health-care personnel who have religious or moral objections to abortion to assist with abortions;

- UVMMC subjects health-care personnel (including nurses) who have religious or moral objections to abortion to different terms or conditions of employment than health-care personnel who do not share the same religious or moral objections;

- UVMMC discriminates against health care personnel (including nurses) because of their religious beliefs or moral convictions in opposition to abortion; and,

- UVMMC maintains a Conflict-of-Care policy that facially violates provisions of the Church Amendments.

## I.   JURISDICTION

Paragraph (c)(1) of the Church Amendments prohibits recipients of funds for programs authorized under the Public Health Service Act ("PHSA") from discriminating against health care personnel who decline to perform or assist in the performance of abortions contrary to their religious or moral convictions. Paragraph (c)(1)(A) and (B) state:

> (1) No entity which receives a grant, contract, loan, or loan guarantee under the Public Health Service Act, . . . after June 18, 1973, may—
>    (A) discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, or
>    (B) discriminate in the extension of staff or other privileges to any physician or other health care personnel,
>  . . . because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.[5]

Since October 1998, UVMMC has received a grant from the Health Resources and Services Administration ("HRSA"), a component of HHS, for Part C of the Ryan White HIV/AIDS Program,[6] as authorized by sections 2651-67 of the PHSA.[7] For the most recently completed three-year project period, which ended April 30, 2018, UVMMC reported that it cumulatively expended

---

[5] 42 U.S.C. § 300a-7(c)(1). Paragraph (c)(1) of the Church Amendments also reference the Community Mental Health Centers Act, Public Law 88-164, 77 Stat. 282 (1963), and the Developmental Disabilities Services and Facilities Construction Amendments of 1970, Public Law 91-517, 84 Stat. 1316 (1970).

[6] Completed application from UVMMC to HRSA for Funding Opportunity No. HRSA-18-005, Ryan White HIV/AIDS Program Part C HIV Early Intervention Services Program: Existing Geographic Service Areas, at 1, Aug. 9, 2017 (on file with HHS OCR) (summarizing grant history under the applicant's introduction).

[7] Codified at 42 U.S.C. §§ 300ff-51 to 300ff-67. The award notices identify §§ 2651-2667 and 2693 of the PHSA, as amended, authorize the award. *E.g.* Notice of Award from HRSA to UVMMC for OP [Outpatient] Early Intervention Services with Respect to HIV Disease, at Box no. 16 (issued Aug. 9, 2017). The award notices identify terms and conditions, including compliance, as applicable, with 45 C.F.R. part 75. *E.g., id.* Each award cautions that "[f]ailure to comply with the remarks, terms, conditions, or reporting requirements may result in a draw down restriction being placed on your Payment Management System account or denial of future funding." *E.g., id.* at 3.

$1.6 million of federal financial assistance.[8]

The funding opportunity announcement for the Ryan White Part C grant states that awards are subject to the HHS Uniform Administrative Requirements Governing Awards to Non-Federal Entities[9] ("HHS UAR") and that the applicant is "required to have the necessary policies, procedures, and financial controls in place to ensure . . . compli[ance] with the [sic] all federal funding requirements and prohibitions such as lobbying, gun control, abortion, etc."[10] In its application for funds for the 3-year project period beginning May 1, 2018, and ending April 31, 2021, UVMMC certified that it "[w]ill comply with all Federal statutes relating to nondiscrimination," and "[w]ill comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."[11] The notice of award terms and conditions accepted by UVMMC for this current project period reiterate that UVMMC must operate the award in compliance with the HHS UAR and any applicable statutes.[12] Section 75.300(a)-(b) of the HHS UAR further specifies that awards must comply with U.S. statutory requirements, including requirements prohibiting discrimination in HHS funded programs.[13]

## II.   OCR FINDINGS

### A.   UVMMC's Conflict-of-Care Policy Violates the Church Amendments.

UVMMC's current health care personnel staffing policies discriminate against professionals who cannot in good conscience participate in elective abortions for religious or moral reasons. This policy violates the Church Amendments on its face as well as UVMMC's contractual assurances to HHS.

In 2011 UVMMC adopted policies governing when it would allow personnel to opt-out of medical procedures due to ethical or religious conflicts and updated those policies in 2014. Under these policies, UVMMC knew that several of its employees could not in good conscience participate in abortions.

---

[8] Completed Federal Financial Report (SF-425) from UVMMC to HRSA (submitted Aug. 15, 2018) (for the project period of May 1, 2015 to April 30, 2018).

[9] 45 C.F.R. pt. 75.

[10] HRSA, Notice of Funding Opportunity, FY 2018, *Ryan White HIV/AIDS Program Part C HIV Early Intervention Services Program: Existing Geographic Service Areas,* Funding Opportunity Nos. HRSA-18-001, HRSA-18-004, HRSA-18-005, at 10, 33 (on file with HHS OCR).

[11] *Id.* (appearing in UVMMC's *Assurances for Non-Construction Programs*, SF-424B (signed Aug. 9, 2017)).

[12] *See, e.g.,* HRSA, Notice of Award, FY 2018 (Award No. 2 H76HA002032100) (issued Apr. 2, 2018), 2 (no. 16), 3 (program specific term no. 7 ("This award is subject to 45 CFR 75 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards."), 5 (standard term No. 1), 6-7 (standard term no. 12 regarding Federal law and discrimination) (on file with the Office for Civil Rights).

[13] *See* 45 C.F.R. § 75.300(a)-(b) (imposing obligations on the Federal agency to ensure that "U.S. statutory and public policy requirements" including those "prohibiting discrimination" are incorporated in the terms and conditions of the Federal award and requiring the non-Federal entity to comply with all requirements the award).

Prior to 2017, UVMMC purportedly did not provide elective abortions. On or about September 2017, however, UVMMC adopted an express policy of supporting access to elective abortions and the evidence shows that UVMMC had begun staffing personnel for elective abortions months prior. UVMMC changed its abortion policies and practices with little to no input from employees or staff and implemented them without prior notice.

Although UVMMC knew several staff members, such as **REDACTED**, deeply and sincerely objected to assisting with abortions, it assigned them to participate in abortion procedures against their objections anyway. As explained below, these personnel were pressured by UVMMC to participate in abortions.

On February 5, 2018, UVMMC amended its Conflict-of-Care Policy governing when UVMMC would allow employees to decline to participate in elective abortions. The policy, which is still in effect, provides that an employee may request to be excused from participation in medical procedures, including "elective termination of a pregnancy," that conflict with the employee's "cultural values, ethics, or religious beliefs." *See* Conflict of Care: Staff Conscientious Objection, University of Vermont. UVMMC, however, limits staff ability to decline to participate in elective abortions as follows:

> In any scenario where circumstances prevent arrangements for alternate coverage the [objecting] staff member will be expected to provide the assigned care to ensure that patient care is not negatively impacted.

> Refusal to perform assigned job functions will be addressed in accordance with established corrective action procedures, in consultation with leadership and Human Resources.

*Id.* at 2. The policy, therefore, expressly contemplates situations where UVMMC knows health care personnel object to participating in elective abortions, but will nevertheless require such staff to "provide the assigned care" (*viz.* an elective abortion), and will discipline them if they fail to comply with UVMMC's demands. Such situations of conflict are only possible because UVMMC chooses to provide abortion services while not adopting staffing plans and rotations that would fully respect the known requests of its professionals to not participate in abortions.

Paragraph (c)(1)(A) and (B) of the Church Amendments, however, creates an *unqualified* right for health care personnel to decline to participate in abortions without fear of adverse employment actions or loss of staff privileges. *See* 42 U.S.C. § 300a-7(c)(1). The Church Amendments put the burden on providers who choose to provide abortion services to create staffing policies that fully respect the consciences of its professional staff. Providers may also choose not to accept PHSA funds if they are uncomfortable with the conditions such acceptance imposes by law. Because UVMMC's Conflict of Care policy admits to circumstances where UVMMC can and will force staff—on pain of adverse action or discipline—to participate in abortions against their moral or religious objections, it facially violates paragraph (c)(1)(A) and

(B) of the Church Amendments with respect to abortion procedures.[14]

B. <u>UVMMC Discriminates Against Health Care Personnel Who Have Religious or Moral Objections to Participating in Abortions.</u>

Since at least the spring of 2017, UVMMC scheduled health care personnel, including nurses, to assist with elective abortions despite specific and repeated requests from personnel not to be assigned to elective abortions due to religious or moral objections. Nevertheless, UVMMC repeatedly assigned health care personnel to participate in elective abortions without giving advance notice of the nature of the procedure. Additionally, UVMMC scheduled objecting health care personnel to assist with elective abortions knowing that other staff, who did not have such objections, were available to assist with the procedures. Although UVMMC could have readily, and without interruption to patient services, accommodated the religious or moral objections to elective abortion of its health care personnel, it nevertheless intentionally and unnecessarily assigned objecting personnel to such procedures.

UVMMC's scheduling of objecting health care personnel to assist with abortions was discriminatory within the meaning of the Church Amendments. Once a nurse or other health care professional is assigned to a medical procedure, he or she assumes responsibility for providing the indicated care. A failure to follow through with the indicated care, if the staffer is not replaced by an appropriate substitute, may subject that professional to discipline by his or her employer and risks a referral by the employer or the patient to a professional licensing authority for potential discipline. Health care personnel who object on religious or moral grounds to assisting with abortions, once assigned to a patient undergoing an abortion, are, therefore, subjectively and objectively placed under substantial pressure to participate over their objections. Health care personnel who are coerced in that way suffer moral injury, are subjected to a crisis of conscience, and frequently experience significant emotional distress, even if they succeed in declining to assist in the procedure after the assignment is made.

In the particular case of the Complainant, Nurse **REDACTED** was, on at least one occasion, deliberately led to believe **REDCATED** was scheduled to assist in a procedure that did not involve the abortion of an unborn human life, when it in fact did. When **REDACTED** discovered the truth of the matter, **REDACTED** immediately objected, but was coerced by UVMMC into participating in the abortion anyway, and reasonably feared UVMMC would fire **REDACTED** or report **REDACTED** to licensing authorities if **REDACTED** followed **REDACTED** conscience. The experience left **REDACTED** deeply traumatized.

Although these, and similar coercive actions committed by UVMMC, were discriminatory *per* se, the evidence shows they were also motivated by discriminatory intent.

UVMMC effected its discrimination through certain employees, nursing leadership, and managers who expressed overt disregard or hostility to religious and moral objections to persons participating in abortions. Those employees and managers include, but are not limited to,

---

[14] Because the Church Amendments provisions at issue explicitly cover abortion and sterilization, this facial violation finding would apply to sterilization procedures as well, which it appears UVMMC also offers. *See* https://www.uvmhealth.org/medcenter/Pages/Conditions-and-Treatments/Vasectomy.aspx.

**REDACTED**, **REDACTED**, **REDACTED**, and **REDACTED**. For example, **REDACTED** repeatedly revealed disdain for individuals who expressed religious or moral objections to abortion. It was also **REDACTED** who, knowing that Nurse **REDACTED** objected to abortions because of **REDACTED REDACTED** faith, assigned **REDACTED** to an elective abortion; deliberately misled **REDACTED** into believing that the procedure was not an elective abortion; and then refused **REDACTED** request to be relieved from the procedure despite being in a position to provide a suitable substitute even after the ruse was discovered. When Nurse **REDACTED** and other similarly situated health care providers raised concerns about UVMMC's discriminatory conduct to their supervisor, **REDACTED**, **REDACTED** failed to remedy the discrimination. Instead, UVMMC continued to assign health care personnel to elective abortions over their objections. At the same time, UVMMC and **REDACTED** accommodated health care personnel who had non-religious or non-moral objections to assisting with certain procedures.

## III.    CONCLUSION AND REMEDY

For the foregoing reasons, OCR has determined that UVMMC has violated paragraph (c)(1)(A) and (B) of the Church Amendments, both facially and as applied, by discriminating in the employment, promotion, or termination of employment of any physician or other health care personnel, and by discriminating in the extension of staff or other privileges to any physician or other health care personnel.[15]

OCR is charged with helping ensure entities come into compliance with Federal laws protecting conscience and prohibiting coercion in health care, including the Church Amendments. Accordingly, OCR requests that UVMMC notify OCR **within thirty (30) days from the date of this letter** whether UVMMC intends to work collaboratively with OCR to (1) change its policies and procedures requiring health care personnel to participate in abortion; and (2) take immediate steps to remedy the effect of its past discriminatory conduct. OCR is willing and able to engage with UVMMC to identify specific and appropriately tailored remedies.

However, if the above deadline expires and UVMMC has not provided OCR sufficient assurance that it will come into compliance and remedy the violations, OCR will immediately forward this Notice of Violation and the evidence supporting OCR's findings in this matter[16] to HRSA for consideration and appropriate action under 45 C.F.R. §§ 75.371-374.

## IV.    ADVISEMENTS

The findings in this letter are not intended, nor should they be construed, to cover any issues regarding UVMMC's compliance with any part of the Church Amendments, including paragraph (c)(1)(A) or (B), that this letter does not specifically address. In addition, the findings in this letter do not cover issues or authorities, including other grant funding that UVMMC receives or may receive, that this letter does not specifically address, nor does it preclude future

---

[15] 42 U.S.C. § 300a-7(c)(1)(A) & (B).

[16] OCR's investigative file contains documents, correspondence, pleadings, Nurse **REDACTED** Complaint, records of the Equal Employment Opportunity Commission, and notes of interviews with numerous individuals who have personal knowledge of specific facts that support the foregoing OCR Findings.

determinations about compliance based on subsequent or further investigations. Nothing in this letter precludes OCR from making referrals to any other HHS component or other federal agencies, including the Department of Justice, for appropriate action.[17]

OCR is providing a copy of this Notice of Violation to the Complainant and **REDACTED** counsel and it will be made available, with appropriate redactions, to the public.

Sincerely,

/s/

Roger T. Severino
Director

/s/

Luis E. Perez
Deputy Director
Conscience and Religious Freedom Division

---

[17] OCR would inform UVMMC of any such referral.

# Attachment 2

# Grant Certification

OMB Number: 4040-0007
Expiration Date: 01/31/2019

## ASSURANCES - NON-CONSTRUCTION PROGRAMS

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0040), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET. SEND IT TO THE ADDRESS PROVIDED BY THE SPONSORING AGENCY.**

**NOTE:**   Certain of these assurances may not be applicable to your project or program. If you have questions, please contact  the awarding agency. Further, certain Federal awarding agencies may require applicants to certify to additional assurances. If such is the case, you will be notified.

As the duly authorized representative of the applicant, I certify that the applicant:

1. Has the legal authority to apply for Federal assistance and the institutional, managerial and financial capability (including funds sufficient to pay the non-Federal share of project cost) to ensure proper planning, management and completion of the project described in this application.

2. Will give the awarding agency, the Comptroller General of the United States and, if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award; and will establish a proper accounting system in accordance with generally accepted accounting standards or agency directives.

3. Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain.

4. Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency.

5. Will comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§4728-4763) relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration (5 C.F.R. 900, Subpart F).

6. Will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to: (a) Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin; (b) Title IX of the Education Amendments of 1972, as amended (20 U.S.C.§§1681-1683, and 1685-1686), which prohibits discrimination on the basis of sex; (c) Section 504 of the Rehabilitation

Act of 1973, as amended (29 U.S.C. §794), which prohibits discrimination on the basis of handicaps; (d) the Age Discrimination Act of 1975, as amended (42 U. S.C. §§6101-6107), which prohibits discrimination on the basis of age; (e) the Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255), as amended, relating to nondiscrimination on the basis of drug abuse; (f) the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (P.L. 91-616), as amended,  relating to nondiscrimination on the basis of alcohol abuse or alcoholism; (g) §§523 and 527 of the Public Health Service Act of 1912 (42 U.S.C. §§290 dd-3 and 290 ee- 3), as amended, relating to confidentiality of alcohol and drug abuse patient records; (h) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§3601 et seq.), as amended, relating to nondiscrimination in the sale, rental or financing of housing; (i) any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and, (j) the requirements of any other nondiscrimination statute(s) which may apply to the application.

7. Will comply, or has already complied, with the requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (P.L. 91-646) which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal or federally-assisted programs. These requirements apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

8. Will comply, as applicable, with provisions of the Hatch Act (5 U.S.C. §§1501-1508 and 7324-7328) which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

**Previous Edition Usable**

**Authorized for Local Reproduction**

**Standard Form 424B (Rev. 7-97)**
**Prescribed by OMB Circular A-102**

9.  Will comply, as applicable, with the provisions of the Davis-Bacon Act (40 U.S.C. §§276a to 276a-7), the Copeland Act (40 U.S.C. §276c and 18 U.S.C. §874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§327-333), regarding labor standards for federally-assisted construction subagreements.

10. Will comply, if applicable, with flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973 (P.L. 93-234) which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

11. Will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 (P.L. 91-190) and Executive Order (EO) 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in floodplains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972 (16 U.S.C. §§1451 et seq.); (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176(c) of the Clean Air Act of 1955, as amended (42 U.S.C. §§7401 et seq.); (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended (P.L. 93-523); and, (h) protection of endangered species under the Endangered Species Act of 1973, as amended (P.L. 93-205).

12. Will comply with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

13. Will assist the awarding agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. §470), EO 11593 (identification and protection of historic properties), and the Archaeological and Historic Preservation Act of 1974 (16 U.S.C. §§469a-1 et seq.).

14. Will comply with P.L. 93-348 regarding the protection of human subjects involved in research, development, and related activities supported by this award of assistance.

15. Will comply with the Laboratory Animal Welfare Act of 1966 (P.L. 89-544, as amended, 7 U.S.C. §§2131 et seq.) pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this award of assistance.

16. Will comply with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. §§4801 et seq.) which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

17. Will cause to be performed the required financial and compliance audits in accordance with the Single Audit Act Amendments of 1996 and OMB Circular No. A-133, "Audits of States, Local Governments, and Non-Profit Organizations."

18. Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program.

19. Will comply with the requirements of Section 106(g) of the Trafficking Victims Protection Act (TVPA) of 2000, as amended (22 U.S.C. 7104) which prohibits grant award recipients or a sub-recipient from (1) Engaging in severe forms of trafficking in persons during the period of time that the award is in effect (2) Procuring a commercial sex act during the period of time that the award is in effect or (3) Using forced labor in the performance of the award or subawards under the award.

| SIGNATURE OF AUTHORIZED CERTIFYING OFFICIAL | TITLE |
|---|---|
| Krystine R Spiess | Project Director |
| APPLICANT ORGANIZATION | DATE SUBMITTED |
| The University of Vermont Medical Center Inc. | 08/09/2017 |

Standard Form 424B (Rev. 7-97) Back

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(See attachment)

## DEFENDANTS

University of Vermont Medical Center

County of Residence of First Listed Defendant   **Chittenden County**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1   U.S. Government
Plaintiff
- [ ] 2   U.S. Government
Defendant
- [ ] 3   Federal Question
*(U.S. Government Not a Party)*
- [ ] 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product   Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | Liability   [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 320 Assault, Libel &   Pharmaceutical   Slander   Personal Injury | | [ ] 820 Copyrights   [ ] 830 Patent | [ ] 430 Banks and Banking   [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'   Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   [ ] 368 Asbestos Personal   [ ] 340 Marine   Injury Product   [ ] 345 Marine Product   Liability | | [ ] 840 Trademark   [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations   [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY**   [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 190 Other Contract | Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal   Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923)   [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | Injury   [ ] 385 Property Damage   [ ] 362 Personal Injury -   Product Liability   Medical Malpractice | [ ] 751 Family and Medical Leave Act | [ ] 864 SSID Title XVI   [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts   [ ] 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation   [ ] 791 Employee Retirement | | [ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights   **Habeas Corpus:** | Income Security Act | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 871 IRS—Third Party | Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/   Sentence | | 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | Accommodations   [ ] 530 General | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty   Employment   **Other:** | [ ] 462 Naturalization Application   [ ] 465 Other Immigration | | |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other   Other   [ ] 550 Civil Rights | Actions | | |
| | [ ] 448 Education   [ ] 555 Prison Condition   [ ] 560 Civil Detainee -   Conditions of   Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1   Original
Proceeding
- [ ] 2   Removed from
State Court
- [ ] 3   Remanded from
Appellate Court
- [ ] 4   Reinstated or
Reopened
- [ ] 5   Transferred from
Another District
*(specify)*
- [ ] 6   Multidistrict
Litigation -
Transfer
- [ ] 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 300a-7

Brief description of cause:
Violation of prohibition on discrimination by health care entity receiving federal funding

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
16 Dec 2020

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE   1011          MAG. JUDGE

Sum Issued                                2:20-cv-213

*(stamp)* RECEIVED
DEC 16 2020
U.S. DISTRICT COURT
BURLINGTON, VT

CIVIL COVER SHEET ATTACHMENT

Attorneys of Record for Plaintiff United States of America:

MATTHEW J. DONNELLY
Attorney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-616-2788
matthew.donnelly@usdoj.gov


JONATHAN A. OPHARDT
First Assistant United States Attorney
District of Vermont
P.O. Box 570
Burlington, VT 05402
802-951-6725
jon.ophardt@usdoj.gov